\* THE ASHUELOT RAILROAD CO. & A. *v.* ELLIOT & A.

A mortgage is not foreclosed against the mortgagor in the second mode provided by Gen. Stats., ch. 122, sec. 14—by peaceable entry, one year's possession, and publication of notice—unless notice is published;—actual notice is not sufficient.

The vested right of a mortgagor to redeem, under the general law, cannot be destroyed or impaired by a special statute enacting that the mortgage has been foreclosed, or that it shall be foreclosed in case the debt be not paid within one year from the passage of the act.

IN EQUITY. Case agreed. The plaintiffs (the railroad company, and S. W. Hale, F. F. Lane, and others, stockholders), as a corporation, and as individuals, claim the right to redeem the road by paying up the bonds of the company, secured by mortgages on the road, one of which was on that part of the road in this State, and the other on that part in Vermont. The defendant, Elliot, denies the existence of any such right, by reason of certain acts done by those interested in the premises, hereafter stated, and the following laws passed by the legislature :                                          o

AN ACT for the relief of the stockholders and creditors of the Ashuelot Railroad Company.

*Be it enacted by the Senate and House of Representatives in General Court convened :*

SECTION 1. That the mortgage made by the Ashuelot Railroad Company, on the first day of January, A. D. 1851, of their railroad, granting and conveying the same, with its franchise and rights thereto belonging, as established by the laws of this State, to John Henry Elliot, in this State, in trust to pay said company's bonds to the amount of two hundred thousand dollars, dated on or before said first of January, 1851, and payable ten years therefrom, with interest, and also the other mortgage dated the second of January, A. D. 1855, made by said company, granting and conveying their railroad and

---

\* Decided Aug. 14, 1873.                                    REPORTER.

estate lying in Vernon, in the State of Vermont, to said Elliot, in trust for the purpose also as aforesaid, be, and said mortgages are, hereby confirmed, and shall be held valid and binding upon the parties thereto, according to their tenor; and all the votes and acts of said company, in relation to said mortgages, and in giving possession of said mortgaged property to the trustee aforesaid, for condition broken, to the use and benefit of the owners of the bonds aforesaid, be, and are hereby, ratified and confirmed, and shall be held valid and binding upon all parties thereto.

SEC. 2. *Be it further enacted,* That in case said mortgages be not paid or discharged within one year from the passage of this act, William Haile and all other owners of the bonds aforesaid, or their successors, are hereby made the perpetual assigns and substitutes of said Ashuelot Railroad Company, with power to do any and all things as fully and completely as said company could have done before its insolvency, it being the intent and meaning of this act to transfer the corporate powers and duties of said company from the stockholders to the creditors of the same, in perfection and satisfaction of the mortgages above described and said company's votes in relation thereto.

And it is also provided, that the bonds aforesaid shall hereafter be held and accounted as the sole paid up shares of the Ashuelot Railroad Company, and shall constitute its entire capital, and the owners of the same shall be entitled to share certificates respectively upon the surrender of their bonds aforesaid, subject to the laws of this State.

SEC. 3. *Be it further enacted,* That this act take effect on and after its passage.

Approved July 4, 1861.

AN ACT for the relief of the bondholders of the Ashuelot Railroad Company, and to facilitate the settlement of the trust for their benefit.

*Be it enacted by the Senate and House of Representatives in General Court convened:*

SECTION 1. That John Henry Elliot, the trustee for the bondholders, to whom the railroad, franchises, lands, buildings, and estate, with the privileges and appurtenances thereunto belonging, in this State and the State of Vermont, of the Ashuelot Railroad Company, were mortgaged by said corporation, by its two deeds of January 1, 1851, and January 2, 1855, may sell the same at public auction, giving previous notice thereof by publication at least four weeks successively in some newspaper published at Keene, and upon such sale and conveyance by said trustee accordingly, the railroad, property, and estate of said corporation, with all the corporate rights, franchises, powers, and privileges heretofore conferred on said corporation, shall become and be invested in the purchaser: Provided, however, that no sale shall be made at a price less than the full amount now due on the outstanding bonds of said corporation secured by said mortgages. And the Cheshire Rail-

road Company is hereby authorized, if it shall think proper, to become the purchaser, at said sale, and to make and issue such notes, bonds, or other obligations as it may think proper for the purpose of such purchase.

SEC. 2. The proceeds of said sale, and the funds and other property now held by said trustee in trust for the holders of the bonds aforesaid, after payment of the proper expenses of the trust and compensation of said trustee, shall be by said trustee accounted for and paid over to the holders of the bonds secured by said mortgages, according to their respective interests therein.

SEC. 3. So much of the act entitled "An act for the relief of the stockholders and creditors of the Ashuelot Railroad Company," approved July 4, 1861, as is inconsistent with the provisions of this act, is hereby repealed.

SEC. 4. This act shall take effect on its passage.

Approved July 6, 1866.

The railroad company was incorporated in 1846. In 1850 it had expended about $500,000 in constructing the road, about $200,000 of which was received on about 2,000 shares of the stock, at $100 par value. On that day the company authorized its president and three of its directors to mortgage said road, its franchises, lands, and privileges, to said Elliot, then its clerk and treasurer, in trust to secure the payment of its bonds to an amount not exceeding $200,000 ; and on January 1, 1851, they duly executed the mortgage of its franchises, lands, buildings, and appurtenances to said Elliot, clerk of said company, "in trust for the purposes and upon the conditions following, to wit,—" If the said Ashuelot Railroad Company, their successors or assigns, shall well and truly pay, or cause to be paid, their bonds to the amount of $200,000, and the interest thereon, which bonds shall bear date on or before January 1, A. D. 1851, and made payable in ten years from January 1, with six per cent. interest to be paid semiannually, then this obligation to be void and of no effect. And if said company shall refuse or neglect to pay the principal and interest of said bonds, or any part thereof, according to their terms, then, and in that case, and in no other, the said mortgagees, or any individual or individuals holding said bonds, and being the owners thereof, may enter upon said described property hereby conveyed, and take possession of the same for the purpose of foreclosing said mortgage, reserving, however, to the mortgagors all the rights and privileges of redeeming said property provided by the laws of the State of New Hampshire." On said January 1, 1851, the company issued their bonds for $200,000, with semi-annual interest coupons, the bonds payable in ten years. Prior to this date the company had leased the road to the Connecticut River Railroad for the term of ten years from January 1, 1851, at a rent of $30,000 per year, which was paid to said Elliot, treasurer, a portion of which was appropriated to paying the interest on the bonds and balance of floating debt; and a balance of about

$66,000 was in his hands in 1860. The bonds were not paid at maturity nor since, unless it results from facts hereinafter stated by operation of law.

At the annual meeting of the corporation in 1860, holden by adjournment on October 9, it was voted, among other things, " to buy up the shares of the original stock of the company at a rate that shall absorb the disposable surplus of the company, and do the same, if possible, before the expiration of November coming, and in such manner as they, the directors, shall deem for the interest of those concerned. At an adjourned meeting, December 11, 1860, it was " voted that the directors be hereby authorized to issue preferred stock in payment of the company's bonds when due, said stock to be entitled to all the net earnings of the road, it being understood and provided at the same time that all the present issue of stock shall be redeemed at $30 per share if the same be presented for redemption before July 1, 1861;" also, " voted that the directors are hereby authorized to make a surrender of the company's road to the mortgagee, if, upon the maturity of the bonds, the holders thereof, for the space of six months, shall refuse or neglect to accept or agree to accept preferred shares in payment therefor, or said directors may make such surrender sooner than as above, if, in their opinion, it would better subserve the interest of parties concerned." Adjourned to January 11, 1861, when, upon motion, it was " voted to authorize Mr. Fuller, the president, Mr. Elliot, the treasurer, and Mr. Hale, one of the directors, jointly to lease said railroad to the Cheshire Railroad Company. * * nine months at forty per cent. of the earnings, and thereafter until January, 1865, at $12,000 per annum;" lessees to keep the road insured against fire and in good repair. Adjourned to February 11, when the lease to the Cheshire Railroad above referred to was properly executed. No preferred stock was ever issued. About February 11, 1861, peaceable possession of the road was given to said Elliot as trustee, according to the company's said vote; and he has ever since managed it, and received its entire income, paying annually, with two or three exceptions, the net income in dividends to the bondholders. About 1,800 of the 2,000 shares of the Ashuelot Railroad stock was bought up as herein before provided, at $30 a share. The company held an annual meeting in 1861, and chose the usual officers, who never qualified, and held no other meeting until 1872, as hereinafter stated. In 1872 the individual plaintiffs, who are the owners of more than one twentieth of the stock of the company which had not been surrendered as aforesaid, and on which no payment of $30 a share or any other sum had been made, petitioned a justice of the peace under the statute, who called a meeting of the stockholders for the choice of officers, at which the ordinary officers of such corporations were chosen and qualified. At the suggestion of the said Elliot, said laws were passed by the legislature; but no action whatever was ever taken by any of the parties interested in the matter, or by the bondholders, by virtue or authority of said acts. The foregoing is the plaintiffs' statement of the

facts which they expect will appear, and on which they claim that the mortgages mentioned are not foreclosed.

For the purpose of bringing this question before the full bench, the parties agree that this case may be reserved; and when this question of law is disposed of, the case is to be discharged, and the action to stand for such future proceedings as the parties shall be advised to take. It is expressly agreed that neither party is to be bound by anything contained in the above statements, and that neither party waives any exception or objection which would have been open had this case not been made.

*Cushing*, for the defendant, Elliot.

I. The acts of the State of New Hampshire, of July 4, 1861, and July 6, 1866, have at least this effect: they give the sanction of the legislature to the mortgages, to the entry for condition broken, and to the foreclosing of the mortgage. Section second of the act of 1861 substantially enacts that the mortgage shall be foreclosed in one year from its passage, and also makes provision for a new corporation to take the place of the old one. The act of 1866 goes upon the ground that the mortgage is foreclosed, and, in providing for the sale, provides that all the proceeds and all the property of every kind held in trust by the trustee shall be paid over to the bondholders, thus treating them as the absolute owners, and entirely ignoring any right of the corporation to redeem. In so far as the franchise to be a corporation is concerned, and which it is said cannot be a subject of sale and transfer except by some positive provision of law, provision is made in the first of these acts for its transfer to the bondholders, and by the second for its transfer to the purchaser, whether the Cheshire Railroad or otherwise. So far, therefore, as the authority of the State is concerned, the mortgage and its complete foreclosure are fully recognized and legalized by these acts. *Hall* v. *Sullivan Railway* cited 2 Redfield on Railways 465, ed. of 1869.

II. It is not, perhaps, entirely easy to determine satisfactorily the nature of these mortgages. The cases of *Farmers' Loan & Trust Co.* v. *Hendrickson*, 25 Barb. 484, *Palmer* v. *Forbes*, 23 Ill. 300, *Hunt* v. *Bullock, id.* 320, *Pennock* v. *Coe*, 23 Howard (U. S.) 117, cited in 2 Redfield on Railways 481, 483, seem to hold that the rolling stock, and all the other personal property necessary for operating the road, are to be considered as fixtures, and that the mortgage in such a case is to be considered as the mortgage of real estate. If the court should take this view of the mortgage in question, and hold that the New Hampshire mortgage under consideration was a conveyance of lands within the terms of General Statutes, chapter 122, section 1, then the question would be, whether, according to the provisions of that statute, this mortgage has been foreclosed. We take this position, viz., that, under the second mode provided in section 14 of the same chapter, the mortgage is foreclosed. The mortgagee has been in peaceable posses-

sion for condition broken for at least twelve years. This possession was yielded to the trustee in pursuance of a vote of the corporation, and has all the publicity of actual possession during that time, and also the recognition by the statutes printed with the case. We think that, under the circumstances of this case, there was no occasion for the publication mentioned in that statute : such publication would have been merely nugatory, and without any possible object or value. We think the authorities show that in all such cases actual notice is sufficient as against the parties to be affected by it, and the railroad corporation and its stockholders cannot object on account of want of notice by publication.

The provision concerning publication of notice was introduced into our statutes in the " act relating to the foreclosure of mortgages," passed July 4, 1834, and provided that the mortgage should not be foreclosed against any person but the mortgagor and his heirs, unless the notice was published. Pamphlet Laws, 1834, page 151. The provision was for the protection of innocent purchasers without notice, creditors, &c., and the evil to be remedied by the statute was the injury to such persons who otherwise might be defrauded. The subsequent statutes (Rev. Stats. 247, and Gen. Stats. 254) appear to be mere revisions of the law of 1834, and do not substantially change it. And we contend further, that in any view, the familiar principles, in regard to the substitution of actual notice for constructive notice by registry or publication, would govern the construction of these statutes.

III. In so far as this mortgage is not within the statute in regard to mortgages of lands, we understand that by the laws of New Hampshire the legal estate is absolute in the mortgagee after condition broken, and any redemption must depend on the chancery jurisdiction of the supreme judicial court. In this view our position is, that, under all the circumstances, the claim to open this foreclosure is *stale,* and barred by the lapse of time, and this notwithstanding the ordinary practice of allowing twenty years in regard to simple mortgages of real estate. Story Eq. Jur., sec. 1520. In that section this language occurs : " But equity will often treat a lapse of a less period as a presumptive bar, on the ground of discouraging stale claims or gross laches, or unexplained acquiescence in the assertion of an adverse right." *Wendell* v. *N. H. Bank,* 9 N. H. 404.

We have endeavored to conduct this discussion in view of the facts stated by the plaintiffs in the case, although we do by no means think they can be made out.

It may be added, that an entry after condition broken is *prima facie* to foreclose, and that all the facts stated appear to us to confirm this presumption.

*Perley,* for the plaintiffs.

The mortgage is not foreclosed.

I. It is not foreclosed under the general laws of the State. Elliot

has not entered under process, nor taken peaceable possession, and advertised, as is required, to foreclose a mortgage of real estate ; nor has he pursued the course prescribed for the foreclosure of a mortgage of personal estate. In cases where the provisions of the statute prescribe the mode of foreclosure, those provisions govern the foreclosure. In other cases, the supreme court have general equity jurisdiction to foreclose.

II. .The mortgage is not foreclosed by or under the private act of July 4, 1861.

1. That act undertakes to foreclose the mortgage by the mere lapse of one year from its passage, without notice of any kind, without a sale, without requiring possession of the road to be taken and held, and without any bill or other legal process. It is not a legislative, but a judicial act. It is, in substance and effect, a judicial decree, that the mortgage should be foreclosed if the mortgage debt were not paid in one year : and this is exactly the decree that a court of equity would have made on a bill to foreclose the mortgage ; for a decree of foreclosure in equity follows the statute in giving one year to redeem, unless there is some reason to vary the general rule. The act is in this respect a clear and flagrant usurpation of the legislative upon the judicial department of the government; is beyond the scope of legislative authority, and in violation of the bill of rights. Bill of Rights, art. 38.

For this reason,—because the act undertakes to decide a particular cause by a new rule not known to the general law of the State, instead of leaving the parties to settle their rights in regular proceedings, according to the general law,—the act is void, and no right can be derived under it. It is not the case where a new remedy is given by a general law. No remedy is provided by which the parties can show and defend their respective rights. It is not a remedy at all, but a decision and final disposition of that particular cause. Neither of the parties can resort to any provision of the act for any hearing or inquiry that could give any remedy under the act. It was a decision, in that individual case, that there was a valid mortgage ; that there was a mortgage debt, and a right to redeem ; and it was a decree declaring that the mortgage should be foreclosed if the debt were not paid in one year, precisely as if the legislature were a court inquiring into the facts of the case, deciding the legal rights of the parties, and giving a final judgment establishing their rights, and decreeing the manner in which they should be enforced. The authorities are numerous, and, so far as we have seen, unanimous, that, under a constitution like ours, such an act is void, because it is a judicial, not a legislative act. *Merrill* v. *Sherburne*, 1 N. H. 199–203 ; *Howard* v. *Bugbee*, 24 Howard 461 ; *Routsong* v. *Wolf*, 35 Mo. 174 ; *Dodge* v. *Woolsey*, 18 Howard 331 ; *Goenen* v. *Schroeder*, 8 Minn. 387 ; *Denny* v. *Mattoon*, 2 Allen 361 ; *Bruffett* v. *The Railroad, &c.*, 25 Ill. 353 ; *Cornell* v. *Hichens*, 11 Wis. 353 ; *Robinson* v. *Magee*, 9 Cal. 81 ; *Dikeman* v. *Dikeman*, 11 Paige 484 ; *The People* v. *Hays and the City of San Francisco*, 4 Cal. 127 ;

*Robinson* v. *Howe*, 13 Wis. 341 ; *Pearce* v. *Patton*, 7 B. Monroe 162 ; *Dubois* v. *McLean*, 4 McLean 486 ; *De Chastellux* v. *Fairchild*, 15 Pa. St. 18 ; *Bryson* v. *Bryson*, 44 Mo. 232 ; *Orton* v. *Noonan*, 23 Wis. 102 ; *Conway* v. *Cable*, 37 Ill. 82 ; *Fletcher* v. *The Rutland Railroad*, 39 Vermont 633.   There have been some decisions, of doubtful author-ity, that the legislature may confirm an equitable title by a private act removing technical and formal objections to the equitable title.   But this act, instead of confirming an equitable title, takes away an equi-table right,—that is to say, the right in equity of the mortgagors to redeem, according to the law of the State.

2.  The act impairs the obligation of the contract between the parties to the mortgage.

Under the mortgage, the railroad had the right to redeem by paying the mortgage debt.   This right to redeem would remain until it was barred, according to the terms of the mortgage and the law of the land.   It was by the contract in the mortgage that the mortgagors had the right to redeem.   The right would belong to them as part of the contract implied in the mortgage, though it had not been secured by the express terms of the mortgage.   But the mortgage expressly reserves " to the mortgagors all the rights and privileges of redeeming said property provided by the laws of the State of New Hampshire."   By the laws of the State, nothing less can be meant than the *general laws* of the State ; not a single private act, taking away the right itself reserved of redeeming according to the laws provided for redeeming mortgages *by the laws* of the State.   *Bronson* v. *Kinzie*, 1 Howard 311 ; *McCracken* v. *Hayward*, 2 Howard 608 ; *Woodruff* v. *Trapnall*, 10 Howard 190 ; *Curran* v. *Arkansas*, 15 Howard 304 ; *Bruffett* v. *The Railroad*, 25 Ill. 353 ; *Cornell* v. *Hichens*, 11 Wis. 353 ; *Robinson* v. *MaGee*, 9 Cal. 81.

3.  If the legislature had the right to repeal, alter, and amend the act incorporating the railroad, they could not, by the exercise of the right, impair the obligation of a contract, made by or with the road, before the repeal, alteration, or amendment.   This contract, made by and with the road, was a valid contract, made under the authority of the State ; and the State had no more authority to impair it than a contract made directly by the State herself.   The authorities on this point are entirely decisive.   *Bruffett* v. *The Railroad*, 25 Ill. 353 ; *St. Louis* v. *Russell*, 9 Mo. 507 ; *Smith* v. *Morse*, 2 Cal. 524 ; *Benson* v. *The Mayor of New York*, 10 Barb. 223 ; *Slack* v. *The Railroad*, 13 B. Monroe 1 ; *Dodge* v. *Woolsey*, 18 Howard 331 ; *Bank* v. *Debolt*, 18 Howard 380 ; *Bank* v. *Thomas*, 18 Howard 384 ; *Bank* v. *Skelly*, 1 Black 436 ; *Van Hoffman* v. *Quincy*, 4 Wallace 535 ; *Hawthorne* v. *Calef*, 2 Wallace 10 ; *Conant* v. *Van Schaick*, 24 Barb. 87. Here, however, was no repeal, alteration, or amendment of the char-ter.   The act had no more effect on the charter than a judicial decree of foreclosure would have had.   The charter, and all the provisions of it, remained exactly as before : no new power was given, nor any power taken away or changed.

4.  The act is also in violation of the article in the bill of rights,

which declares that " no subject shall be deprived of life, liberty, or estate, but by the judgment of his peers and the law of the land." Bill of Rights, art. 18.

This provision is of the same meaning as the like phrase in Magna Charta. *Wilson* v. *Mayo*, 1 N. H. 55. The right to property cannot be taken away but by some process or proceeding warranted by law,—that is to say, by the general law of the land, and not by a direct interference in the particular case contrary to the law of the land. A private, special act, like this of July 4, 1861, is not *the law of the land*, for a law of the land must be a law of general application to all cases of the same kind throughout the land. " It is by the law in its due and orderly administration through appropriate tribunals, and not by force of an act of legislation only, that the subject can be deprived of his property, in the true sense of that clause of the constitution which secures to him the protection of " the law of the land." BIGELOW, C. J., *Denny* v. *Mattoon*, 2 Allen 382,—citing 2 Kent's Com. 13 ; Sedgwick on St. & Con. Law 538 ; *Taylor* v. *Porter*, 4 Hill (N. Y.) 140 ; *Wynehamer* v. *The People*, 13 N. Y. 378 ; *Hoke* v. *Henderson*, 4 Dev. (N. C.) 15 ; *Sohier* v. *The Massachusetts General Hospital*, 3 Cush. 483–493. BRONSON, J., speaking of the same provision in the constitution of New York, says,—" The words ' by the law of the land,' as here used, do not mean a statute passed for the purpose of working the wrong. That construction would render the restriction absolutely nugatory, and turn this part of the constitution into mere nonsense. The people would be made to say to the two houses, You shall be vested with the legislative power of the State ; but no one shall be disfranchised, or deprived of any of the rights of a citizen, unless you pass a statute for that purpose." *Taylor* v. *Porter*, 4 Hill 145.

III. Elliot, having been treasurer, clerk, and general manager of the railroad, as he states in his answer, and also trustee of the mortgage for the bondholders, can make no profit from dealing with the funds and property which he held and managed in a fiduciary character ; and, even if the mortgage is foreclosed, he must account for all the profits he has made from dealing in those funds ; and the funds may be traced into any investments that he has made of them. If, under color of this private act, passed without notice *at his suggestion*, he can retain the wealth he has acquired in dealing with this property and these funds thus held by him in trust, this will be another added to the numerous instances in this country in which those who have worked themselves into the management of railroads have contrived, with the aid of acts *lobbied* through the legislature, to enrich themselves and impoverish the stockholders.

*Lane, pro se.*

Besides other facts of more or less importance, the case presents the following,—all or nearly all of which are matters of record, and indisputable :

1. That in 1850, mortgages of the Ashuelot Railroad Company, their rights and franchises, were made and executed to the defendant, Elliot, then clerk and treasurer of the company, as trustee, to secure the company's bonds, to be dated January 1, 1851, payable in ten years, not exceeding $200,000, to raise means to complete the road,—the condition of which, among other things, provided that any bond-owner of a bond, unredeemed at its maturity, might take possession of the road for condition broken, for the purpose of foreclosing the mortgages; and also further securing all the rights and privileges of redeeming the property provided by the laws of the State to the stockholders. The first of these precautionary and unusual provisions in the condition of the mortgages was evidently for the benefit of the bond-owners, and the last one for the security of the stockholders.

2. That in 1860 the company had accumulated a fund of about $66,000, which they had on hand at their disposal.

3. That the company voted to "buy up" as many shares of the stock as should be offered before July 1, 1861, at $30 a share, with this fund,—and that they actually did buy up about 1,800 of the 2,000 shares then outstanding.

4. That the company offered the bond-owners preferred stock of the company, to take all the net income of the road, in payment of their bonds.

5. That if they neglected to accept such stock for six months after the bonds became due, the directors might surrender the road to the trustee, or sooner if they thought best for the interests of all parties.

6. That a lease of the road was executed on February 11, 1861, by the president, Mr. Fuller, by the trustee, the defendant, and by Mr. Hale, who was a bond-owner, to the Cheshire Railroad Company until 1865.

7. That the bond-owners did not accept preferred stock in satisfaction of their debts.

8. That the defendant, Elliot, was given possession of the road about February 11, 1861, and has received the income ever since, and paid dividends to bond-owners as he has seen fit.

From the above facts it is very evident—

*First.* That the bondholders did not intend or desire to take possession of the road for the purpose of foreclosing their mortgages, for, if they had, they would have proceeded according to the provisions made in the conditions of the mortgages, which authorized any bond-owner to do it under the general laws of the State for foreclosing mortgages. But they neither did any such thing, nor attempted it. Nor did the stockholders, or the trustee, Elliot, understand that the directors were to surrender the road to the mortgagee for the purpose of foreclosing any of the stockholders' rights to the road, but only to secure the actual possession and income of the road for the benefit of the bondholders; for if they had so understood it, they would not have made and executed a lease of the road, two months after the vote was passed, to the Cheshire Railroad for four years longer; and, besides, Elliot would have advertised for a foreclosure as the law required.

*Second.* The bondholders not only did not seek to foreclose their mortgage and thus take the road, but they did not want to become stockholders in the road in satisfaction of their bonds ; for if they had they would have accepted preferred stock which was offered them, and which secured to them all the net earnings of the road. They pre-ferred the rights of bond and mortgage creditors of the road, to the rights, liabilities, and risks of stockholders. And the stockholders were in a position to do nothing for themselves, only to dispose of the surplus they had on hand. The company offered to buy up all the shares that should be offered before July 1, 1861, at $30 a share. Most of the stockholders disposed of their stock in this way; and those who did not of course continued stockholders of the company, with all the rights and liabilities they ever had, and with the additional advantage of the reduction of the amount of the outstanding capital stock of the company,—if such were an advantage,—by the buying up of the stock of the company. Such seemed to be the true position and relation of all the parties to each other, leaving no room for doubt or misgivings upon the subject up to July 4, 1861, when the legisla-ture, at the suggestion of the trustee, Elliot, who had no personal in-terest in the matter, passed a private act, entitled " An act for the relief of the stockholders and creditors of the Ashuelot Railroad Com-pany," behind which he claims to stand, sheltered and protected by it from all responsibility to those stockholders who. did not dispose of their stock as provided for by the company. It is a private act, spe-cially limited to this case, asked for or wanted by no one except said Elliot. And he now claims that those stockholders, who did not see fit to take $30 a share for their stock, have been cut off and foreclosed of all their rights of property by this act. No stockholder asked for such legislation : no bondholder sought it : it was in violation of their solemn agreement contained in the conditions of the mortgages,—the very instrument by which Elliot received his authority as trustee,—se-curing to the stockholders " all the rights and privileges of redeeming the property secured by the laws of the State of New Hampshire." What, then, is the reasonable interpretation of this statute ?

The first section confirms the validity of the mortgages, and all the votes and acts of the company in relation to said mortgages, and in giving possession of the property to the trustee for condition broken. The second section, in terms, transfers all the corporate rights and pow-ers of the stockholders to the bondholders,—converting their bonds into stock without their consent, and burdening them with the liabili-ties and risks of stockholders,—and forfeits all the stockholders' rights and property, provided the stockholders did not pay up the bonds in one year : a remarkable law, asked for by no one having legally any pecuniary interest in it, with a false and deceptive title calculated to deceive and impose upon the legislature, and containing the statement, which is contrary to fact, that possession of the road was given to the trustee " for condition broken." It may be a relief of both the stock-holders and creditors, if depriving one of them of their entire prop-

erty as is here claimed, and by converting the rights of the other from bonds into stocks with the liabilities and risks of railroad stockholders, and without their consent or perhaps knowledge, could be fairly considered a relief. Can such a law, with this natural and obvious construction, be within the sphere of constitutional legislative action ?  Can mortgage bonds against a corporation be converted into stocks of the same corporation, without the consent of the owners and by the bare act of the legislature, thereby entirely changing the character of his property, and the burdens, liabilities, and risks connected with it ?  And can it also limit and deprive the stockholders of their rights of property contrary to their contract, contrary to the general laws of the land, and contrary to the bill of rights, which assures to every one the enjoyment of his life, liberty, and property ?  Are the rights of property held by such a slight and uncertain tenure as the trustee prescribes for those whose property he manages and controls ? If this is constitutional, if this is just, if this is within the bounds of legislative action, what action of the legislature in relation to a person's private rights and private property would not be just and constitutional ?  And what guaranty has a person for the security of his private property to himself ?  This doctrine would strike at the very foundation of private rights and of private property.  Such is the natural interpretation of this act.  It trifles with, changes, and destroys private property in special cases: it cuts off one person's rights, converts another person's property into a very different species of property without his asking for or consenting to it, at the bare suggestion of a third person, whose only duty is to take good care of the property and its income for the benefit, not of one party alone, but of both parties equally.  Not only have the bondholders claims upon him to be faithful in his trust in managing the property and securing its income to them, but the stockholders,—the owners of the property,—have also a claim upon him, equally imperative, that he take good care to preserve its character and value.

Such being the character of the act, we claim that it is unreasonable, unjust, and unconstitutional and void.  As a special and private act to relieve the mortgages from the provisions of the general laws relating to foreclosures of mortgages, it is void.  The laws of a free country can be no respecter of persons.  Cooley on Constitutional Limitations 355, 391; *Lewis* v. *Webb*, 3 Greenl. 326 ; *Picquet, Appellant,* 5 Pick. 65; *Walley's Heirs* v. *Kennedy*, 2 Greg. 554 ; Opinion, 4 N. H. 572 *et seq. ; Teft* v. *Teft*, 3 Mich. 67 ; Brown's Const. Law 228; *Wynehamer* v. *The People*, 13 N. Y. 432.  So it is unconstitutional and void, as taking away or impairing vested rights.  *Woart* v. *Winnick,* 3 N. H. 473 ; *Dow* v. *Norris*, 4 N. H. 16; *Merrill* v. *Sherburne,* 1 N. H. 213; *Lakeman* v. *Moore,* 32 N. H. 413; *People* v. *J. & M. Plank Road*, 9 Mich. 285 ; *Van Hoffman* v. *Quincy*, 4 Wall. 535 ; *Hawthorne* v. *Calef*, 2 Wall. 10; *Wabash Co.* v. *Beers,* 2 Black 448 ; *Concord Railroad* v. *Greely,* 17 N. H. 55, 56; *I. & E. Turnpike Road Co.* v. *Phillips*, 2 Pa. 184 ; *Bowman* v. *Middleton*, 1 Bay 252 ; Opinion, 4 N. H. 573, 574.

But if the act be not absolutely void, its only legitimate force must be in the nature of an enabling act. This railroad company was and is a public corporation, required by the general laws of the State to live and perform certain public duties. It cannot be presumed, therefore, that the legislature intended to deprive it of the necessary organization to conform to the requirements of the law. And the only reasonable construction to give to the law, therefore, is, that, if the company did not pay their bonds within the time prescribed, the bondholders might elect to convert their bonds into stock, and demand certificates thereof in discharge of their bonds, and to the exclusion of any rights of the old stockholders who had not sold out and surrendered their certificates. It is not reasonable to presume that the stockholders were to be deprived of their rights and franchises, unless the bondholders, the only interested parties assumed to be benefited by it by having their bonds paid by the operation, should accept that position for themselves. Nor is it reasonable or necessary to assume that the bondholders were to be deprived of their bonds, and compelled to take satisfaction thereof in the stock of the road without their own consent. It was, then, at most, an enabling act, giving authority to change the relations of the parties, if the bondholders should elect to do it. But in this view it has had no operation, as the bondholders have never felt disposed to accept the proposed change, preferring to be bondholders to being stockholders. And this idea is in conformity with subsequent legislation, for we find, at the June session of the legislature in 1866, the same trustee procured another private act in relation to the same matter but taking a new tack. It is very likely that there might be some interested parties in this matter, for it appears that the Cheshire Railroad Company own most of the bonds. This act authorizes said Elliot, the trustee of the bondholders, to whom the railroad and all their franchises were mortgaged, to sell the same at public auction, and to pay over the proceeds to the bondholders, not to be sold for a less price than sufficient to pay the bonds in full ; and the Cheshire Railroad were authorized to become purchasers. All acts inconsistent with this were repealed. Here the bondholders were recognized as such. They were not talked about as stockholders, nor treated as such, nor to be paid as such, but as *bona fide*, rightful bondholders, as they were in 1861. And the provisions of this act are consistent only with the idea that the former act was regarded either as unconstitutional and void, or that it was barely an enabling act, and had failed of force because it had not been accepted and acted upon by the only party that could do it—the bond-owners.

Doe, J.   I. The mortgagee in trust claims that the mortgage was foreclosed in the second mode provided by Gen. Stats., chap. 122, sec. 14, which is peaceable entry, one year's possession, and publication of notice ; that, the possession having been yielded to the trustee in pursuance of a vote of the corporation, publication of notice would have been nugatory, so far as the corporation was concerned, the corporation

well knowing all the facts which would have been published; that actual notice is sufficient as against the party having actual notice; that the statute of 1834 provided that the mortgage should not be foreclosed, against any person but the mortgagor and his heirs, unless notice was published; that the provision for publication was for the protection of purchasers, creditors, and others having no actual notice; that the evil to be remedied was the injury to persons who might be defrauded without notice; that the subsequent and present statutes are mere revisions of the act of 1834, without an intent to change it in this particular; and that the doctrine of actual notice, being equivalent to registry, publication, or other formal or constructive notice, is applicable to this case.

We think that the requirement of notice, in the present statute, is not a mere revision of the notice clause of the act of 1834; that the change of phraseology is so material, and on so material a subject, that the legislature must have intended to change the former law, and require publication even as against the mortgagor; that such has been the understanding of the profession; that it has been understood that the doctrine of actual notice being a substitute for formal notice does not apply to such a case as this; and that the notice required by the statute is necessary to a foreclosure, even between mortgagee and mortgagor, at least upon such facts as those stated in this case, and such grounds as those relied upon by the mortgagee. We are therefore of opinion that the mortgage has not been foreclosed, under the general law of the State.

II. As to a foreclosure, aided or effected by the acts of July 4, 1861, and July 6, 1866, we are not aware that, since the decision of *Merrill* v. *Sherburne*, 1 N. H. 199, there has been any reason to regard such a point as doubtful in this State. It would be a matter of regret if there could be any uncertainty as to the constitutional law on such a subject. For reasons so clearly and forcibly stated in the plaintiffs' briefs that there is no occasion to enlarge upon them, this bill may be maintained, notwithstanding the acts referred to.

III. The mortgagee contends that the plaintiffs' claim to redeem is stale, and so long delayed as to show, at least, gross laches, and that there is such an unexplained acquiescence in the assertion of an adverse right that equity will not interfere, although twenty years have not elapsed. If any ground of that kind is tenable, it can be more satisfactorily examined at the trial term when the facts are fully developed: and the consideration of this question, which must be largely a question of fact, is remitted to the trial term.

*Case discharged.*